1   Lionel Glancy (Bar No. 134180)
    lglancy@glancylaw.com
2   Michael Goldberg (Bar No. 188669)
    mmgoldberg@glancylaw.com
3   Susan G. Kupfer (Bar No. 141724)
    skupfer@glancylaw.com
4   Joseph Barton (Bar No. 188441)
    jbarton@glancylaw.com
5   GLANCY BINKOW & GOLDBERG LLP
    1801 Avenue of the Stars, Suite 311
6   Los Angeles, CA 90067
    Telephone: (310) 201-9150
7   Facsimile: (310) 201-9160



FILED
CLERK, U.S. DISTRICT COURT

JUN 23 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

8

9             UNITED STATES DISTRICT COURT

10           CENTRAL DISTRICT OF CALIFORNIA

11   TODD SIMON, on behalf of himself and all      Case No. CV 10 4647-JFW (VBKx)
12   others similarly situated,
                                                   CLASS ACTION COMPLAINT
13                  Plaintiff,
                                                   JURY TRIAL DEMANDED
14          vs.

15   UNITED POTATO GROWERS OF IDAHO,
16    INC.; UNITED POTATO GROWERS OF
     AMERICA, INC.; UNITED II POTATO
17   GROWERS OF IDAHO, INC.; ALBERT
     WADA; WADA FARMS, INC.; WADA
18   FARMS POTATOES, INC.; WADA-VAN
19   ORDEN POTATOES, INC.; WADA
     FARMS MARKETING GROUP, LLC;
20   DOLE FRESH VEGETABLES, INC;
     DOLE FOOD COMPANY, INC.; BLAINE
21   LARSEN FARMS, INC.; POTANDON
22   PRODUCE LLC; GENERAL MILLS, INC.;
     MICHAEL CRANNEY d/b/a CRANNY
23   FARMS; CORNELISON FARMS, INC.;
     SNAKE RIVER PLAINS POTATOES,
24   INC.; DRISCOLL POTATOES, INC.;
25   LANCE FUNK d/b/a

CLASS ACTION COMPLAINT              1

LANCE FUNK FARMS; RIGBY
PRODUCE, INC.; PLEASANT VALLEY
POTATO, INC.; RAYBOULD BROTHERS
FARMS LLC; RD OFFUTT CO.;
IDAHOAN FOODS, LLC and BAYER
CROPSCIENCE LLP,

                    Defendants.

## **INTRODUCTION**

1.     Plaintiff Todd Simon brings this action on behalf of himself individually and on behalf of a plaintiff class (the "Class") consisting of all persons and entities in the State of California who indirectly purchased fresh and process potatoes from Defendants and their co-conspirators from June 18, 2006 to the present (the "Class Period").

2.     The Defendants include individual growers and national produce companies; marketing and shipping agencies working as agents of an under the control of individual grower and produce companies; and an Idaho potato cooperative, which, in turn with other regional cooperatives, makes up the  United Potato Growers of America, Inc.  ("UPGA").  UPGA is a national cooperative through which Defendants have coordinated and facilitated their price-fixing conspiracy.

3.     Plaintiff alleges that during the Class Period, Defendants and their co-conspirators used anticompetitive practices to fix, raise, maintain and/or stabilize the prices at which fresh and process potatoes were sold in California by controlling and reducing the aggregate supply of potatoes.  Defendants entered into

CLASS ACTION COMPLAINT          2

an agreement to manage the supply of potatoes in the California for the purpose of the elevating the sales prices of fresh and process potatoes.  During the Class Period, Defendants coordinated their actions to implement a price- fixing and supply management conspiracy.  Among the actions Defendants took were (1) agreeing to limit potato planting acreages; (2) agreeing to pay farmers to destroy existing stocks or not to grow additional potatoes; and (3) agreeing to reduce the overall number of potatoes available for sale to direct purchaser entities. Additionally, Defendants implemented secondary market strategies designed to limit the flow of potatoes to the market when prices were low so that those prices could be increased.

4.     As a result of Defendant's anticompetitive behavior, Plaintiff and the other members of the Class paid artificially inflated prices for potatoes.  Such prices exceeded the amount that would have paid if the prices had been determined by a competitive market.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this class action pursuant to the Class Action Fairness Act ("CAFA"), 28 U.S.C. §1332(d)(2), because the matter in controversy, upon information and belief, exceeds $5,000,000, exclusive of interests and costs, and this matter is a class action in which Class members are citizens of a different state than that of Defendant.

6.     Venue is proper in this Court pursuant to 28 U.S.C. §1391 because the misconduct at issue took place and had effects in this district.  Further, Plaintiff and numerous Class members reside in this district and purchased potatoes and potato products, and were thereby injured, in this venue.

CLASS ACTION COMPLAINT          3

7.     This Court has personal jurisdiction over Defendants because Defendants received substantial compensation and profits from sales of such products in this district.  Thus, Defendant's liability arose in part in this County.

## PARTIES

### I.     Plaintiff

8.     Plaintiff Todd Simon, a California resident, indirectly purchased potatoes manufactured and/or distributed by one or more of the Defendants in the State of California during the Class Period.

### II.    Potato Cooperatives

9.     Defendant UPGA is a non-profit corporation organized, existing, and doing business under the laws of Utah with its offices and principal place of business located in Salt Lake City, Utah.  During the Class Period, UPGA participated in and facilitated a supply- restriction and price fixing scheme.

10.     UPGA's members located throughout the United States produce approximately 70 to 80% of the nation's fresh-market potatoes.

11.     UPGA's stated mission is to "manage national potato supply so as to positively affect grower profitability."  It achieves this goal primarily by limiting potato-planting acreage among its members, including its ten member cooperatives.  UPGA also coordinates market calls among competitors so that the co-conspirators can limit the flow of potatoes to the market when prices are low in order to further increase prices.

12.     Defendant United Potato Growers of Idaho, Inc. (formerly known as "United Fresh Potato Growers of Idaho" ("UPGI") is a corporation organized,

existing and doing  business under the laws of Idaho with its offices and principal place of business located in Idaho Falls, Idaho.

13.     UPGI is a founding cooperative member of UPGA.

14.     Defendant Albert Wada is an Idaho Grower who along with other regional representatives in 2005 formed the nationwide cooperative, Defendant UPGA.

15.     In 2009, after some members had left the group, UPGI announced it would disband it if were unable to reach its membership goal of controlling 80% of Idaho's fresh potato acreage.  In late 2009, UPGI announced that its members had reached 80% and the organization would continue.

16.     Defendant United II Potato Growers of Idaho, Inc. ("United II") is a corporation organized, existing and doing business under the laws of Idaho with its offices and principal place of business located in Idaho Falls, Idaho.  During the Class Period, United II participated in the supply-restriction and price-fixing scheme.

17.     In 2007, UPGI formed United II, a second cooperative consisting of UPGI members.  United II created a joint venture with Defendant RD Offutt Co. (the largest potato grower in the country) and Defendant Idahoan Foods.  Idahoan Foods is one of the largest potato dehydraters in the country, and the United II grower-owners supply all the potatoes for its Idaho and Nevada plants.

**III.     Potato Growers, Packers, Marketing Agencies and Licensors**

18.     Defendant Wada Farms, Inc. is a corporation organized, existing and doing business under the laws of Idaho with its offices and principal place of business located in Blackfoot, Idaho.

CLASS ACTION COMPLAINT          5

19.     Defendant Wada Farms Potatoes, Inc. is a corporation organized, existing and doing business under the laws of Idaho with its offices and principal place of business located in Blackfoot, Idaho.

20.     Defendant Wada-Van Orden Potatoes, Inc. is a corporation organized, existing and doing business under the laws of Idaho with its offices and principal place of business located in Blackfoot, Idaho.

21.     Wada Farms, Inc., Wada Farms Potatoes, Inc. and Wada-Van Orden Potatoes, Inc. are collectively referred to as "Wada Farms."

22.     Wada Farms operates an irrigated farming enterprise in southeastern Idaho growing fresh and process potatoes, seed and commercial wheat, corn, alfalfa , sugar beets and hybrid canola seed.  Established in 1943, Wada Farms operates in six diversified farming locations in three counties, totaling around 30,000 irrigated acres.  The Wada enterprise also includes a fresh potato, onion, sweet potato marketing group, a 140,000-square-foot fresh potato packing warehouse and a trucking company.

23.     Growing over a billion potatoes annually, Wada Farms is among the largest growers and packers in the industry.

24.     In addition to numerous national co-packers, Wada Farms has potato co-packing agreements with entities in California, Washington, Idaho, Colorado, Nebraska, North Dakota, Wisconsin, Illinois, Minnesota, Kentucky, Alabama, Georgia, New York, Pennsylvania, Maine, Missouri, Florida, North Carolina, Pennsylvania, New Jersey and Massachusetts.

25.     Defendant Albert Wada is the Chairman and former CEO of Wada Farms.  Albert Wada is domiciled and residing at 1385 W. Highway 39, Pingree, Idaho 83262-1126.

CLASS ACTION COMPLAINT          6

26.     Defendant Wada Farms Marketing Group, LLC ("Wada Farms Marketing") is a limited liability company organized, existing and doing business under the laws of Idaho with its offices and principal place of business located in Pingree, Idaho.

27.     Wada Farms Marketing acts as the agent of and handles the marketing and sales for Wada Farms and Dole-label potatoes, onion and sweet potatoes. Wada Farms Marketing has offices in Idaho, Oregon and Texas and distributes potatoes throughout the United States.

28.     Wada Farms Marketing holds the exclusive marketing for all potatoes, onions and sweet potatoes sold under the national Dole label.

29.     Defendant Dole Fresh Vegetables, Inc. ("Dole Fresh Vegetables") is a corporation organized, existing and doing business under the laws of California with offices and its principal place of business located in Monterey, California. During the Class Period, Dole Fresh Vegetables participated in the supply-restriction and price-fixing scheme alleged.

30.     Dole Fresh Vegetables is a division of Defendant Dole Food Company, Inc.

31.     Dole Fresh Vegetables sources, harvests, distributes and markets over 35 varieties of fresh vegetables, including iceberg lettuce, celery, cauliflower, red and green leaf lettuce, romaine lettuce, butter lettuce, spinach, spring mix, broccoli, Brussels sprouts, green onions, asparagus, snow peas, radishes and artichokes.

32.     Dole Fresh Vegetables has exclusive licensing agreements for a line of potatoes and onions with the Wada Defendants and with other producers for other vegetables.

CLASS ACTION COMPLAINT            7

33.     Dole Fresh Vegetables is a participant in various trade associations frequented by potato marketers, growers or potato growing cooperatives, such as the United Fresh Produce Association and the Produce Marketing Association.

34.     Dole Fresh Vegetables is an authorized out-of-state potato broker with the Idaho Potato Commission.

35.     Defendant Dole Food Company, Inc. ("Dole Food") is a corporation organized, existing, and doing business under the laws of Delaware with its principal executive offices located in Westlake Village, California.

36.     Founded in Hawaii in 1851, Dole Food had 2007 revenues of $6.9 billion and is the world's largest producer and marketer of fresh fruit and vegetables. Dole Fresh Vegetables and Dole Food are referred to collectively as "Dole Defendants."

37.     As the licensor of potatoes sold by the Wada Defendants, the Dole Defendants had control over many aspects of the marketing, selling, packaging, quality and branding of these potatoes. As the exclusive marketer of "Dole" brand onions, potatoes and sweet potatoes, the Wada Defendants enjoyed frequent contact with and supervision from Dole representatives.

38.     Throughout the Class Period, the Dole Defendants exercised actual or apparent authority over the Wada Defendants as those Wada entities publicly and repeatedly announced their intentions to reduce potato supplies nationwide and encouraged competitors to do the same. The Dole Defendants invested authority in the Wada Defendants to act on Dole's behalf

39.     Defendant Blaine Larsen Farms, Inc. ("Larsen Farms") is a corporation organized, existing and doing business under the laws of Idaho with its offices and principal place of business located in Hamer, Idaho.

CLASS ACTION COMPLAINT          8

40.     Larsen Farms grows, packs and distributes potatoes under the Larsen Farms brand and private labels. Larsen Farms operates farmland and facilities in Idaho, Nebraska and Colorado and services retail and food-service customers worldwide. The company also makes processed potato products (crushed, diced, flaked and sliced), which it supplies to food processors.

41.     Larsen Farms grows, stores, processes and transports its own potatoes and refers to itself as a "vertically integrated potato grower."

42.     Blaine Larsen of Larsen Farms was one of the founders of UPGI, a UPGI Board Member, and an originator of the price-fixing scheme alleged.

43.     Defendant Potandon Produce LLC ("Potandon") is a limited liability company organized, existing and doing business under the laws of Idaho with its offices and principal place of business located in Idaho Falls, Idaho.

44.     Once a division of Pillsbury, Potandon is now an independent company owned by five prior Pillsbury managers and six grower/shippers who control the company's operations. With over 45,000 acres and six packing facilities in Idaho, Potandon sells potatoes and onions to major retailers, club stores, wholesalers, produce distributors and restaurant chains across the United States at the direction, and on behalf of and/or as the agent of its grower/shippers.

45.     In June 2002, Potandon merged the sales and marketing activities from the Idaho Fresh Cooperative ("IFC") into its operations. IFC is a 70-grower cooperative with over 25,000 acres of potatoes and six packing sheds located throughout the Snake River Valley.

46.     In June 2002, Potandon also merged the sales and marketing activities for High Country Potato, located in Rexburg, Idaho.

CLASS ACTION COMPLAINT            9

47.     Two Washington grower/shippers (Harvest Fresh Produce in Othello and Balcom & Moe of Pasco) merged with Potandon in June of 2005. In January of 2006, Potandon merged with Murakami Produce, the largest supplier of onions in the Idaho/Oregon region. In October 2006, Potandon merged the sales activities for Defendant Larsen Farms into Potandon.

48.     Outside of Idaho, Potandon has established an extensive network of over 60 potato and onion co-packers in 24 states with another nine co-packers in Canada. In addition, Potandon is involved in multiple joint-venture growing areas and has several exclusive sales agreements.

49.     By combining these sales and marketing functions of its growers, Potandon has positioned itself as the largest marketer of potatoes in North America. Potandon controls a 25% share of the Idaho potato market and a 12% share of the total national potato market.

50.     Potandon owns the exclusive licensing rights to the Green Giant® brand for fresh potatoes and onions (pursuant to an agreement with Defendant General Mills). Potandon also markets SunSpiced potatoes.

51.     Potandon sells potatoes throughout the United States. It solicits internet sales of potatoes on its website at http://www.potandon.com/contact.htm.

52.     Defendant General Mills, Inc. ("General Mills") is a corporation organized, existing and doing business under the laws of Delaware with its offices and principal place of business located in Minneapolis, Minnesota.

53.     General Mills is an authorized out-of-state processor with the Idaho Potato Commission.

54.     As the licensor of potatoes sold by the Potandon Defendants under the trademark "Green Giant Fresh®," General Mills had, through its exclusive

licensing agreement, control over many aspects of marketing, selling, packaging, quality and branding of these potatoes. General Mills' involvement with Potandon's operations includes specifying and designing packaging, designing and managing cross promotions, headquarters sales calls, quality and safety standards and inspecting potato growing and packaging operations.

55.     As the exclusive licensor of the "Green Giant Fresh®" trademark, Potandon enjoys frequent contact with and supervision from General Mills representatives.

56.     Throughout the Class Period, General Mills exercised actual or apparent authority over Potandon and its growers as those entities publicly and repeatedly announced their intentions to reduce potato supplies nationwide and encouraged competitors to do the same.

57.     Defendant Michael Cranney is an individual doing business as Cranney Farms, an assumed business name under the laws of Idaho, located in Oakley, Idaho. Michael Cranney is domiciled and residing at 503 W. 1300 S., Oakley, Idaho 83346.

58.     Cranney Farms grows process and fresh potatoes, sugar beets, corn, wheat and barley.

59.     Michael Cranney of Cranney Farms is a founding member of UPGI and one of the original incorporators of UPGA. At a January 2008 UPGA meeting, Mr. Cranney, UPGA Supply Management Committee Chairman, reminded grower attendees of UPGA's instruction to reduce potato acreage in the coming year by 5% — and told the audience that UPGA would advise even non-members to do the same.

CLASS ACTION COMPLAINT          11

60.     Defendant Cornelison Farms, Inc. ("Cornelison Farms") is a corporation organized, existing and doing business under the laws of Idaho, and its principal place of business is located in Rexburg, Idaho.

61.     Cornelison Farms grows, packages and ships fresh potatoes.

62.     With Mr. Wada, Keith Cornelison of Cornelison Farms organized the first meeting of growers in September 2004 of what would eventually become the UPGI. Cornelison Farms is a founding member of UPGI and has long advocated for collective action to reduce potato supplies.

63.     Defendant Snake River Plains Potatoes, Inc. ("Snake River Plains Potatoes") is a corporation organized, existing and doing business under the laws of Idaho, and its principal of business is located in Rexburg, Idaho.

64.     Snake River Plains Potatoes is a founding member of UPGI and a UPGA member. David Beesley, chief executive officer of Snake River Plains Potatoes, is a member of the UPGA executive committee.

65.     Defendant Driscoll Potatoes, Inc. ("Driscoll Potatoes") is a corporation organized, existing and doing business under the laws of Idaho, and its principal place of business is located in American Falls, Idaho.

66.     Driscoll Potatoes is an integrated potato producer that grows, packs, stores and ships its own potatoes.

67.     Driscoll Potatoes is a founding member of UPGI, and Loraine Driscoll of Driscoll Potatoes is an original incorporator of UPGA. Loraine Driscoll has served on the UPGA Board of Directors.

68.     Defendant Lance Funk is an individual doing business as Lance Funk Farms, an assumed business name under the laws of Idaho, located in American

Falls, Idaho. Lance Funk is domiciled and residing at 3853 Rast Rd., American Falls, Idaho 83211.

69. Lance Funk is a potato grower.

70. Lank Funk Farms is a founding member of UPGI.

71. Defendant Rigby Produce, Inc. ("Rigby Produce") is a corporation organized, existing and doing business under the laws of Idaho and is located in Rigby, Idaho.

72. Rigby Produce is an integrated potato producer that grows, packs, stores and ships its own potatoes.

73. Rigby Produce is a founding member of UPGI.

74. Defendant Pleasant Valley Potato, Inc. ("Pleasant Valley Potato") is a corporation organized, existing and doing business under the laws of Idaho and is located in Aberdeen, Idaho.

75. Pleasant Valley Potato is an integrated potato producer that grows, packs, stores and ships its own potatoes.

76. Pleasant Valley Potato is a founding member of UPGI.

77. Defendant Raybould Brothers Farms LLC ("Raybould Brothers Farms") is a limited liability company under the laws of Idaho and is located in Rexburg, Idaho.

78. Raybould Brothers Farms grows and sells fresh potatoes.

79. Raybould Brothers Farms is a founding member of UPGI, and Jeff Raybould of Raybould Brothers Farms is an original incorporator of UPGA.

80. Defendant RD Offutt Co. ("RD Offutt") is a subsidiary of RDO Holdings Co., a corporation organized, existing and doing business under the laws

CLASS ACTION COMPLAINT          13

of North Dakota with offices and its principal place of business located in Fargo, North Dakota.

81.    RD Offutt has approximately 160,000 acres of farming operations across eight states, and is one of the nation's largest producers of potatoes, with approximately 60,000 acres devoted to potatoes.

82.    RD Offutt, one of the world's largest potato growers, sent representatives to the initial meetings establishing the UPGI and participated in the group's price-fixing efforts.

83.    In 2007, R.D. Offutt partnered with Defendant United II to create the joint venture North American Foods LLC (now known as Idahoan Foods, LLC), contributing potato processing plants in several states. This joint venture enabled potato growers to offload surplus potatoes and further reduce supplies and thereby further facilitated and contributed to the price-fixing scheme alleged.

**IV.    Non Grower Co-Conspirators**

84.    Defendant Idahoan Foods, LLC (formerly known as North American Foods, LLC, referred to as "Idahoan Foods") is a limited liability company organized, existing and doing business under the laws of Delaware with offices and its principal place of business located in Grand Forks, North Dakota.

85.    North American Foods is a joint venture between Defendants RD Offutt, a potato grower and processor, and United II, a co-operative of potato growers. North American Foods manufactures mashed-potato products and dehydrated products.

86.    Wada Farms is one of the grower/owners involved in this joint venture that supplies potatoes to Idahoan Foods.

CLASS ACTION COMPLAINT          14

87.     North American Foods was formed "to create a broad network of potato processing plants with convenient access to markets and to customers."

88.     As one of the largest potato dehydrators in the country, North American Foods enables its United II grower-owners to divert surplus potatoes to a dehydration operation while profiting from vertical integration.

89.     Defendant Bayer CropScience LLC ("Bayer CropScience") is a corporation organized, existing and doing business under the laws of North Carolina with offices and its principal place of business located in North Carolina.

90.     In 2008, Bayer CropScience became a "sponsor" of UPGA's United Potato Partners program. That sponsorship continued in 2009 and 2010.

91.     Bayer CropScience is the primary sponsor of UPGA's United Potato Partners program, which is described on UPGA's website as supporting "the underwriting of United's databases, administration and educational seminars. The seminars provide a means for direct, two-way communication with potato growers."

92.     Bayer CropScience's participation in and funding of the United Potato Partner Program, enables UPGA to "offset" the cost to growers of UPGA's data-gathering and price-fixing efforts. UPGA literature explains that this funding partnership arises out of the "common objective" among UPGA, its growers, and its corporate vendors: "The objective that a potato grower has in common with each vendor is that each party wishes to survive and thrive in the potato business."

## AGENTS AND CO-CONSPIRATORS

93.     The acts alleged in this complaint were authorized, ordered or done by Defendant's officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendant's businesses or affairs.

CLASS ACTION COMPLAINT          15

94.     Certain other persons, firms, corporations and entities have participated as unnamed co-conspirators as defendants in the violations alleged in this Complaint.  In order to engage in the charged offenses and alleged violations, these co-conspirators have performed acts and made statements in furtherance of the antitrust violations and conspiracies alleged in this Complaint.

## CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action on behalf of himself individually and on behalf of the Class, pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, which is defined as:

> All persons and entities in the State of California who indirectly purchased fresh or process potatoes from Defendants or their Co-Conspirators between June 18, 2006 through the present.  The Class does not include: (1) Defendants; (2) Defendant's parents, subsidiaries, or affiliates; (3) any co-conspirators; (4) any governmental entities; or (5) any judicial officer to whom this case is assigned.

96.     Plaintiff does not know the exact number of Class members because such information is in Defendant's exclusive control.  Plaintiff believes that, due to the nature of the trade and commerce involved, there are likely at least tens of thousands of Class members in the state of California such that joinder of all Class members is impracticable.

97.     Plaintiff's claims are typical of the claims of the Class in that Plaintiff purchased potatoes from Defendant, all Class members were damaged by the same wrongful conduct, and the relief sought is common to the Class.

98.     Numerous questions of law or fact arise from Defendant's anti-competitive conduct that is common to the Class.  These common questions include:

(a) whether Defendants and their co-conspirators engaged in or entered into a contract, combination or conspiracy among themselves to fix, maintain, raise and/or stabilize the prices of potatoes sold in the State of California;

(b) whether Defendants' unlawful conduct has enabled them to increase, raise, maintain or stabilize above competitive levels the prices for potatoes sold in the State of California;

(c) the duration of the contract, combination, or conspiracy alleged;

(d) whether the conduct of Defendants and their co-conspirators caused injury to the business or property of Plaintiff and Class members;

(e) the appropriate measure of damages sustained by Plaintiff and Class members;

(f) whether injunctive relief is appropriate; and

(g) if injunctive relief is appropriate, what types of such relief are suitable in this matter.

(h) whether Defendant's conduct violated California Business and Professions Code, §§ 16700, *et seq.*;

(i) whether Defendant's conduct violated California Business and Professions Code, §§ 17200, *et seq.*;

(j) whether Plaintiff and other members of the Class were injured in their business or property by reason of the unlawful conduct of Defendants, and the appropriate measure of class-wide damages; and

(k) whether Plaintiff and members of the Class are entitled to restitution.

99. These common questions of law or fact are common to the Class and predominate over any other questions affecting only individual Class members.

100. Plaintiff will fairly and adequately represent the interests of the Class in that he is a typical purchaser of potatoes from Defendants and/or Defendants' Co-Conspirators and has no conflicts with any other member of the Class. Furthermore, Plaintiff has retained competent counsel experienced in antitrust and California consumer class action litigation.

101. A class action is superior to the alternatives, if any, for the fair and efficient adjudication of this controversy.

102. Prosecution of separate actions by individual Class members would create the risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for the Defendants.

CLASS ACTION COMPLAINT          18

103.   Plaintiff reserves the right to expand, modify, or alter the Class definition in response to information learned during discovery.

## FACTUAL ALLEGATIONS

### A.   The Potato Industry

104.   The United States potato industry is a multi-billion dollar annual market. For example, in 2007 the United States potato market had a total production of 449 million cwt (hundredweight or 100 pounds) of potatoes and the value of production was $3.2 billion.

105.   In 2008, total domestic potato production was 415 million cwt, approximately 7 percent below the 2007 crop levels (due to the supply reduction price-fixing scheme alleged). Despite the reduced production, however, overall market value of production was $3.49 billion, an increase of 13 percent over 2007 production values.

106.   Idaho and Washington are the two largest potato-producing states (growing mostly "fall potatoes"), accounting for over half of United States production. North Dakota, Colorado, Wisconsin, Oregon, Maine and Minnesota accounted for another 30 percent of U.S. production, with 23 other states accounting for the remaining 19 percent.

107.   California, Florida and Texas lead production of winter, spring, and summer potatoes. These potatoes have a smaller share in the total potato market, but satisfy specific needs for the fresh and process markets.

108.   Fresh potatoes are usually sold in the open market and processing potatoes are typically sold through contracts. Processing potato contracts are

usually signed prior to the planting season and specify a potato variety, quantity and base price with incentives based on quality requirements.

109.    The fresh and process potato markets are interconnected. According to Defendants, one of the problems contributing to excess potato supply was process growers planting acres of potatoes not under contract to sell on the open market. Thus, it was crucial to fresh potato growers to get process potato growers to agree to the price fixing conspiracy, as well. Defendants' price fixing scheme, as alleged, was designed to and did fix, raise, maintain and/or stabilize prices for both fresh potatoes and potatoes sold for processing.

110.    Potatoes can be readily stored and transported, making it possible to market them to both the fresh and processed market. The fresh market generally commands the highest price. Nearly two-thirds of potatoes were used for processing in 2008, with frozen French fries and other frozen potato forms being the largest segment. Table stock accounted for 28% of use and the remainder went to feed, seed and other uses.

111.    Many fresh potato growers (such as several of the Defendants) are vertically integrated and handle growing, packing, shipping, and even further processing on the farm. Many of the large potato growers also act as packing and shipping operations for other growers.

112.    Packing sheds generally work in conjunction with growers to wash, grade and pack potatoes to be shipped to direct purchasers such as retailers and distributors.

113.    While potatoes were the single most-consumed vegetable in the United States in 2007, consumption in total pounds and as a percentage of total vegetables consumed have been declining since 2001.  Average yearly potato

consumption was 138.8 pounds in 2001, had declined to 126.0 pounds in 2007 and was forecasted to further decline to 125.3 pounds in 2008.

114.   The decline was true for both fresh potatoes and potatoes for processing, although the decline was greater for fresh potatoes. Fresh potato consumption declined almost 16% from 2001 to 2007 while potatoes for processing declined nearly 6% over the same time period.

115.   Despite declining demand, potato demand is highly price inelastic. A 1% decrease in fresh potato supply can cause up to a 7% increase in price due to a lack of suitable alternatives.

### B. **The UPGA Cartel**

116.   In response to declining prices, Idaho potato growers (who produce approximately one-third of the potatoes in the United States) grew concerned about their profits in the early 2000s. In 2003, several Idaho growers agreed to implement acreage reductions in order to reduce supplies. Given the limited success of these schemes, however, one of the largest potato growers in the country, Defendant Albert Wada, formed an Idaho "cooperative" with other Idaho growers in order to formalize a joint agreement among his competitors to reduce potato supply and fix, raise, maintain and/or stabilize prices.

117.   Mr. Wada began realizing his expressed intent of "managing North American potato supply" by first seeking to organize Idaho potato growers. In late 2004, along with other Idaho potato growers, Mr. Wada co-founded United Fresh Potato Growers of Idaho ("UFPGI"), later renamed UPGI. Mr. Wada hoped UPGI

CLASS ACTION COMPLAINT            21

would serve as a nucleus for an even larger, nationwide "cooperative" with member co-ops in each potato-producing state.

118.   Mr. Wada called his potato price-fixing plan, "United We Stand" and openly discussed how he wanted to "unite" potato growers, "decrease competition" and "rationalize the industry" by collectively curtailing production. UPGA's website makes a similar point: "[i]n 2004, after evaluating the economic realities of the current business climate, a group of potato growers decided that long-term production and supply management are critically needed to provide stability and a reasonable return for growers."

119.   In published articles about this plan, Mr. Wada acknowledged that his activities might be subject to antitrust laws. The attorney for UPGI and UPGA, Randon Wilson, also discussed the fact that the Idaho cooperative (and later the nationwide cooperative) would have to conform to the Capper-Volstead Act and that packers and other ineligible businesses could not participate in the cooperative or their supply reduction schemes. Mr. Wilson is quoted in non-privileged, public articles as saying that in order to receive protection under the Capper-Volstead Act, "[w]e've got to be a pure farmer's cooperative" and packers and other ineligible business could not be involved in the cooperative.

120.   This advice was not followed. Numerous non-grower entities and growers that also were packers were involved with Defendants' price fixing scheme. For example, Wada Farms' own website notes: "Wada Farms is among the largest growers **and packers** in the industry." (Emphasis added.) Thus, UPGI and UPGA have no protection under the Capper-Volstead Act.

121.   The potato cartel was first formalized when Mr. Wada organized a meeting of Idaho potato farmers in September 2004 to discuss how to "curb

production" and "boost prices" for potatoes. At this meeting, Mr. Wada and Keith Cornelison (of Defendant Cornelison Farms) summoned 23 Idaho potato growers to an office in Blackfoot, Idaho, to discuss how their collective efforts at reducing potato supplies would help fix, raise, maintain and stabilize prices.

122.   After more meetings, phone calls and emails among these growers, the group agreed to form UPGI - with the explicit goal of reducing potato supplies through various means.

123.   The 23 growers in attendance at this meeting became the founders of UPGI, which filed for incorporation on November 2, 2004. The founders' operations encompassed approximately 60 percent of the fresh potatoes produced in Idaho and 25 percent of the fresh potato market in the United States.

124.   The individuals at the initial UPGI meeting who explicitly signed on to the supply reduction and price-fixing scheme alleged included: Blaine Larsen (of Defendant Larsen Farms), Albert Wada (of Defendant Wada Farms), and Defendant Michael Cranney (of Cranney Farms) — the three largest growers in Idaho and among the biggest in the US. Other Idaho-based growers at this meeting who became founders of UPGI and signed on to the price-fixing and capacity reduction scheme, some of whom are named as Defendants, include Keith Cornelison (of Defendant Cornelison Farms), David Beesley (of Defendant Snake River Plains Potatoes), George Crapo (of Crapo Farms, Inc.), Mark Cummins (of Cummins Farms/Cummins Family Produce), Loraine Driscoll (of Defendant Driscoll Potatoes), Jeff Duffin (of Duffin Potato Company), Paul Duncan and Defendant Lance Funk (of Lance Funk Farms), Gary Hansen (of Hansen Farms), Dale Mickelson (of Defendant Rigby Produce), Ron Olsen (of Murdock Farms), Jeff Raybould (of Defendant Raybould Brothers Farms), Carl Taylor (of Howard

Taylor & Sons), Kim Wahlen (of Defendant Pleasant Valley Potato), Blair Walker, Dick Watt (of SunSpiced Grower Cooperative) , Lynn Wilcox (of Floyd Wilcox & Sons), Clint Young and Roy Young.

125.   In the Articles of Incorporation of UPGI, the stated purpose of the organization is "to stabilize potato prices and supplies in the State of Idaho and to work with similar cooperatives in other states having similar purposes."

126.   In October of 2004, the UPGI founders issued a press release discussing their goals of "supply management" principles and asked other potato growers from around the country to attend another meeting to discuss the formation of additional regional and national groups to assist in their price-fixing efforts. The next cartel price-fixing meeting occurred on November 3, 2004, at 10:00 a.m. at the Shiloh Inn Convention Center in Idaho Falls, Idaho — the day after UPGI's Articles of Incorporation were filed.

127.   Growers from Colorado, Oregon, Washington, Wisconsin and California joined the Idaho potato farmers at the meeting. The meeting was closed to the media. At the meeting, Mr. Wada announced the group's price-fixing plans to several hundred potato farmers, which prompted a standing ovation. Many farmers signed on to the supply reduction agreement on the spot agreeing to pay annual dues ranging from about $10,000 to $500,000 depending on how much acreage each farmer utilized for growing potatoes. Defendant RD Offutt Co., one of the world's largest potato growers, sent a representative to this meeting and the company subsequently agreed to the price-fixing scheme alleged, as well, and participated in a joint venture to further aid the potato supply reduction efforts.

128.   On December 2, 2004, the 23 founding members of UPGI, all of whom had signed on to the supply management scheme, voted to move the

CLASS ACTION COMPLAINT          24

commitment date to join the co-op to January 17, 2005 — two weeks ahead of the original membership deadline. At this point, the group already had 80 percent of all acres dedicated to fresh potatoes in Idaho committed to supply reductions under its membership agreements.  By February 2005, UPGI was colluding with owners of 91% of the fresh potato grower acreage in Idaho through various means.

129.   The fresh potato market is strongly affected by the processing potato and seed potato markets as they are all interrelated. Cooperation with the process and seed potato growers was crucial for UPGI's success. Thus, UPGI sought out groups of process and seed growers to sign on its anticompetitive scheme.

130.   As of December 2004, UPGI had negotiated "Memorandums of Understanding" ("MOU") with the directors of every potato grower group in Idaho, including Potato Growers of Idaho ("PGI"), Potato Management Company ("PMC"), Seed Potato Growers of Idaho ("SPGI") and the Southern Idaho Potato Cooperative ("SIPCO").  SPGI and SIPCO later joined UPGI as independent districts.

131.   PGI was formed in 1968 to serve as a bargaining unit for growers in contract negotiations with potato processing companies. In the more than 30 years since its organization, PGI's mission has evolved to include representation of growers with governmental, legislative and industry organizations. In 2000, PGI membership opted to end its role as a contract negotiator, and to focus its efforts more fully on its information and representation missions.

132.   PMC was formed in 2000 by a group of Idaho potato growers and shippers to help reduce potato supplies. The group was successful in organizing various programs, including charitable donations and cattle feeding, that removed

several million hundredweight of potatoes from the market. In addition, the group donated over 15 million pounds of potatoes to help reduce domestic supply.

133.   SIPCO was founded in 1997 and acts as the bargaining unit for Idaho frozen process growers. SIPCO also negotiates annual contracts with Idaho and Oregon processors with the goal of providing a stable and reasonable rate of return for the Idaho frozen process grower.

134.   SPGI was a group of seed potato growers. Seed potatoes are produced to be used for planting new crops of potatoes. Once cut into sets and planted, seed potatoes grow into tablestock potato varieties. Seed potatoes themselves are not intended for human consumption.

135.   These groups were not "Capper-Volstead cooperatives," yet UPGI collaborated and conspired with them to reduce potato supplies. Through the cooperation insured by these MOUs, the growers, shippers and other entities working collectively with UPGI to reduce potato supplies accounted for more than 60 percent of *all* Idaho potato acres (and not just the vast majority of those devoted solely to fresh potato production).

136.   In December 2004, as part of these coordinated agreements, PGI (a non-cooperative) issued a statement in its newsletter stating that "supply is manageable but the key to making it so lies in a united and concerted effort to manage supply." PGI re-emphasized that it is in the best interests of all growers to unite in working out a plan to manage supply and spread the responsibility. PGI and UPGI also issued joint newsletters espousing the need to collectively reduce supply.

137.   To achieve its supply reduction objectives, the UPGI developed and started enforcing a set of programs and policies that targeted both production and

marketing of fresh potatoes. The level of potato production was controlled through the implementation of two policies. First, before the beginning of a planting season, the potato production was controlled by enforcing an acreage management program, which was implemented through a bid buy down program. Secondly, during the potato growing season, before harvest, the production was monitored over time and accurate yield predictions were made; this was implemented through a series of field digs.

138. The UPGI's marketing programs also included coordination of potato shipments throughout a marketing year, providing marketing information to potato growers and implementation of secondary market strategies. UPGI also sought to remove excess potatoes by identifying new market opportunities such as donating potatoes to charities.

139. UPGI initially studied and implemented many different methods to reduce potato supply. UPGI's first supply control efforts involved using a price floor by analyzing market information and setting floors for the main fresh pack products. The price floors were eventually abandoned. UPGI also considered making grade standards more stringent because diverting smaller potatoes into processing would also reduce fresh potato supplies and boost market prices.

140. A short time later, UPGI also employed another supply management tool —"shipping holidays." The UPGI marketing committee would review market information, including data from each member's packing operation. Each week they would decide if a "shipping holiday" would be imposed. If a "shipping holiday" was put in place, each potato packing operation would shut down for at least one eight-hour shift in order to further reduce supplies and increase prices.

141.   UPGI realized that its most effective method of controlling supply would be to manage the production of the next year's potato crop through acreage reductions.

142.   UPGI's first year acreage management program was implemented in spring 2005. The number of planted fresh potato acres for the fall 2005 crop was reduced by approximately 15% (26,000 acres) relative to the 2004 year acreage base against which the reduction was measured. The program proceeded in two phases. First, a group of the largest potato growers reduced their planted area by 11,000 acres (15% on average).  Secondly, the first ever bid buy-down program was implemented.  Potato growers were submitting bids on how much they needed to be compensated in order not to plant, and UPGI accepted the best (*i.e.*, lowest) bids, thus resulting in further acreage reductions.

143.   UPGI also executed a secondary market strategy at the beginning of 2005 that removed approximately 8% of potato stock from the market. A surplus from the 2004 fall crop was diverted to charities and food banks. For example, in January 2005 UPGI donated 40,000 pounds of potatoes to food banks for the expressly stated purpose of reducing potato supplies.

144.   Furthermore, the first ever Idaho marketing conference calls were implemented. The calls took place twice a week at the state level (and were later established as once a week at the national level with the formation of UPGA). Prior to a conference call, participating warehouses would log on the UPGI web page and provide information on capacity, stocks and pack-outs. These data, along with other information (prices, trends, weather, etc.), were discussed during the conference call, and were summarized as a marketing summary posted on the

internet to assist with "flow control" and prevent potatoes from being shipped when prices were too low.

145.    With the understanding that these supply management techniques would need to be undertaken on more than just a regional level, UPGI used UPGA and the other co-conspirators to institute its supply-restriction techniques on a much broader, nationwide scale. Mr. Wada and his co-conspirators nationalized (and internationalized) their potato supply-restriction efforts and assisted in forming other regional and national potato cooperatives with this goal in mind.

146.    In December of 2004, UPGI met with growers in Colorado and Wisconsin to aid in the formation of United Fresh Potato Grower groups in those states as well. Oregon growers in Klamath Basin formed another group in that state too. In February 2005, Washington growers also met to coordinate supply restrictions. Regional potato grower cooperatives were later formed in Central California, and other areas of the Southwest, Midwest and West. As UPGA's website states, "Idaho leaders reach[ed] out to growers in other regions and invite[d] them to form their own supply-management cooperatives as part of the united effort. Soon, regional co-ops [were] formed in Colorado, Klamath basin (on the border of California and Oregon), Washington-Oregon, and Wisconsin. (Later, growers in central California, the Southwest, Midwest and West form[ed] co-ops.)"

147.    These regional cooperatives then met to form a national group, under the leadership of Albert Wada, which could coordinate the supply restrictions across the United States and North America.

148.    The original incorporators of UPGA include: Albert Wada (of Defendant Wada Farms); Loraine Driscoll (of Defendant Driscoll Potatoes); and Jeff Raybould (of Defendant Raybould Brothers Farms). The initial Board of

Directors was Tony Amstad (of Amstad Produce Inc. in Oregon); Warren Boegel
(of Boegel Farms in Kansas); Defendant Michael Cranney (of Cranney Farms in
Idaho); Dennis Day (of Montana); Allen Floyd (of Harvest Fresh Produce in
Washington); Tom Franconi (of Kern Produce Shippers in California); Dick Okray
(of Okray Farms in Wisconsin); Ed Staunton (of Staunton Farms in California);
Dave Warsh (of Warsh Farm in Colorado).

149.   According to the UPGA website,"[r]ealizing the need for national
coordination, communication, data gathering and analysis, professional leadership
and staff to handle the many

facets and programs of the organization, United Potato Growers of America [was]
formed" in March 2005. The national cooperative facilitated the nationwide
supply-restriction campaign through its regional cooperative members (which were
in turn made up of individual growers who implemented the actual supply
reductions).

150.   UPGA nationalized the regional supply-restriction scheme initially
developed by UPGI. The UPGA's mission statement read: "[w]e bring order and
stability to the North American potato growing industry and increase our member
potato growers' economic potential by the effective use of cooperative principles."

151.   UPGA's supply control efforts are further confirmed by the mission
statements on its own website: "Vision: We will manage national potato supply so
as to positively affect grower profitability."

152.   In April of 2005, UPGA announced the first nationwide acreage buy-
down program in the history of United States potato production to its members. As
with UPGI's acreage reduction efforts, grower members were allowed to "bid"

CLASS ACTION COMPLAINT          30

acres into the buy-down program if they agreed to plant less acreage than they did in 2004. UPGA member funds would

then be used to compensate those growers who agreed to plant less. Similar programs and acreage reductions have continued to present.

153.    Regarding this acreage buy-down program, Albert Wada is quoted as saying: "This is a great opportunity to bring stability and rationale to our Potato Industry… Through cooperation and unity we can and will help ourselves and each other achieve our goals. We strongly encourage all growers to take advantage of this offer while it is available and join their state or regional cooperative and the United of America Board to reduce 2005 acres."

154.    In April 2005, Mr. Wada also traveled to Prince Edward Island in Canada to facilitate the formation and operation of a North American-wide potato cartel that would reduce potato supplies and fix potato prices across the continent. The entire UPGA Board of Directors met with Canadian growers in Charlottetown, Prince Edward Island, in June 2005. More than 250 growers attended this meeting, preliminarily approved starting a Canadian counterpart to the UPGA, and voted to cap island potato acreage for each grower. As a result of this meeting and as discussed further *infra*, Canadian growers formed the UPGC, which, as reflected in the organization chart set forth previously, became a part of the UPGA.

155.    In June of 2005, UPGA announced that its first acreage buy-down program had been a success. Members collectively agreed to cut their crop by tens of thousands of acres to their lowest levels since 1959. Preliminary estimates showed United States potato acreage down 35,000 acres as a direct result of the UPGA's buy-down program.

156.   The impact of the UPGA program was also noted at the national level. The average potato price was approximately 23 percent higher in 2005 relative to 2004. The United States Department of Agriculture ("USDA") noted that this was due to the bid-buy program

instituted by UPGA, which removed from the market almost 11% of fresh potato production in 2005.

157.   UPGA's officers confirmed the success of their efforts. Jerry Wright, the former CEO of UPGA, was quoted as saying that "due primarily to [UPGA's] three-phase supply management program implemented nationwide, growers have the highest returns ever for this time of the year.... The success of the whole program is the result of the growers' determination to solve their own problems and manage their supply."

158.   On November 16-17, 2005, Idaho growers met to discuss 2006 crop reduction guidelines at the Red Lion Inn in Pocatello, Idaho. Joint meetings were also held with the SIPCO, U.S. Potato Board and the Potato Marketing Company. At these meetings, UPGI members (including Defendant growers) and other Idaho growers agreed to plant 10% less than their 2004 base acres.

159.   UPGA's January 2006 newsletter announced the group's national 2006 crop reduction efforts following the Idaho growers' agreement to reduce plantings by 10% from 2004 acres. Members not agreeing to reduce plantings by 10% were required to pay a $50 per acre assessment. Those growers that agreed to reduce acreage more than 10% were allowed to put their acres into the bid buy-down program for extra compensation.

CLASS ACTION COMPLAINT          32

160. UPGI and UPGA also coordinated potato flow control throughout the marketing year in order to control the quantity of potatoes supplied to the market throughout a marketing year when prices were low.

161. In Idaho, warehouses participating in the "flow control" program represented more than 75% of Idaho's potato packing capacity. Personnel at warehouses entered information on the capacity, stocks and pack-outs on the UPGI webpage on a regular basis. After weekly telephone conversations, price advisory information was then posted on the internet for members and non-members which was then used as the pricing strategy for the coming week.

162. In a 2006 PowerPoint presentation prepared by Albert Wada for UPGA members, titled "The North American Potato Cooperative Movement," Mr. Wada detailed strong encouragement for members to stay committed to the supply-restriction efforts. Slides included the following:

> • UNITED = GROWER PROFITABILITY - The UNITED cooperative is gaining the grower critical mass to be able to EFFECTIVELY manage supply in order to attain fair pricing
>
> • UNITED's System Will Work! - UNITED's programs have helped to increase open market fresh table grower returns for the '05 crop by multiple times '04 crop pricing - Process grower markets are stronger - Econ. 101: The only effective method for influencing price is to manage the supply!
>
> • The law of ECONOMICS will always win and growers will lose if production and supplies are not managed
>
> • UNITED'S STRATEGY? THE WHOLE PILE OF POTATOES HAS TO BE MANAGED!

> • Cooperative growers must create orderly markets and grow the category…instead of fighting for a piece of it by zero-sum competition!

163.    In published articles, Mr. Wada confirmed that the purpose of UPGA was to reduce supply and raise prices:

> [Wada] said the major benefit of the association is communication. Sharing supply management data across a broad growing region has allowed the organization to raise prices by better matching potato supplies with demand.
>
> "We're talking to one another," Wada said. He described the industry's oversupply and poor profitability as "an albatross hanging around our necks for years."
>
> **"Without supply management and grower solidarity, we don't have adequate profit margins," Wada added. "Growers tend to think it is a sin to produce a profit. Potato growers are very independent and the one thing that they can do is independently go broke."** (Emphasis added.)

164.    In another interview, Albert Wada asserted that UPGA had "worked with members to eliminate the potato glut by things like reducing the amount of potatoes planted and pledging not to send potatoes to market in the event of oversupply."

165.    In addition to acreage buy-downs, UPGA also touted its "flow control" efforts to keep potatoes from entering the market. Buzz Shahan, former COO of UPGA, stated that "[y]ou can't enter all of those potatoes into the market in one day. So we monitor the flow of product into the market on a weekly basis and adjust the flow so that we don't create a periodic glut."

CLASS ACTION COMPLAINT         34

166. An August 2007 article in *High Country News,* titled "The Sultans of Spuds - Battered by their own success, farmers form the 'OPEC of Potatoes,'" described the meetings of UPGA and this "potato cartel" as follows:

> Once a month, usually on a Wednesday morning, about a dozen men arrive at the Salt Lake City airport on separate flights from around the country. They are whisked into waiting cars for the five-minute trip to a glass fronted office building nearby. There, in an unpretentious conference room, they meet several more of their associates.
>
> **These men are the leaders of a little-known international cartel, and at meetings such as these, they fine-tune an elaborate system of production targets and quota transfers to control the price of the commodity around which their world revolves.** It is a serious business, backed up with reconnaissance from satellites orbiting high above the Earth, and **the organization's strict code of conduct allows for the use of what its members artfully refer to as "punitive measures" against anyone who violates the rules.** And, at lunchtime, the men always pause to sample their merchandise. "We always serve potatoes. We always serve potatoes, whether it's chips or fried or mashed or whipped or salad," says Barb Shelley, one of a small cadre of people who carry out the organization's legwork. Not even lunch, it turns out, is safe from the group's intense scrutiny: "When we order from the caterer, we say, 'These are potato growers. We want your highest quality potatoes. Do not'" - Shelley pauses ominously - "'give us bad quality.'"
>
> This may sound like a plot lifted straight out of a Mel Brooks movie, **but the potato cartel is real**. And its existence speaks volumes about the often-perverse dynamics of American agriculture. (Emphasis added.)

CLASS ACTION COMPLAINT          35

167.   Mr. Shahan was also quoted in this article as stating that the UPGA's members "are very strong guys that have been kicking people's butts since junior high" and that "to get them in a room and have them discuss market share and things like that, it gets a little Western."

168.   An article in *The Wall Street Journal* titled "This spud's not for you: Co-op of farmers seeks to become OPEC of potatoes" also compared the Defendants' potato supply control conspiracy to that of OPEC: "[i]t took farmer Merrill Hanny three days to bury $100,000 worth of his perfectly good potatoes. He remembers how they crunched beneath his tractor as he plowed over his muddy field in the spring of last year. Mr. Hanny destroyed part of his crop at the behest of the United Potato Growers of America, a fledgling group of regional farming cooperatives. The group aspires to be to potatoes what OPEC is to oil by carefully managing supply to keep demand high and constant, resulting in a more stable return for farmers."

169.   In order to ensure strict compliance with the supply reduction and price-fixing agreement, UPGI and UPGA conducted audits and utilized GPS, aerial photography and satellite imaging to verify that co-conspirators had complied with the quotas and not exceeded the potato acreage upon which they agreed to grow.

170.   At the beginning of the planting season, growers filled out the Planting Intention Form. On this form, the growers recorded their 2004 year base acreage and their current year planting intentions by potato variety. The Planting Intention Form was then the grower's commitment against which the grower's actual performance was evaluated.

171.   UPGA also checked farmers' acreage against the paperwork they submitted to the federal Farm Service Agency for government-support programs.

CLASS ACTION COMPLAINT          36

The documents used to assess the actual acreage grown were the copies of the Farm Service Agency ("FSA") Form 578 (*i.e.*, a report of acreage). Growers had to agree to allow UPGA access to these otherwise confidential submissions.

172.   The UPGI's and UPGA's field representatives would review the grower's planting intention commitment, filed maps and FSA Form 578. Then, the representative would conduct inspections of each parcel of land to verify actual plantings and reductions. The results of the audit were then reported to the Future Crop Committee and the UPGI and UPGA Boards.

173.   In 2006, the fields of 25% of the general membership and of 100% of the UPGI Board members were audited, which represented 65% of the UPGI's fresh potato acres. At that audit, all the audited fields were in compliance with supply reduction scheme and bid buy-down programs. The audit confirmed that the audited members of the UPGI reduced the potato acreage by more than 10% relative to the 2004 year base.

174.   Any growers that did "cheat" were subject to punitive measures and fines. For example, the cooperatives' bylaws allowed them to levy fines of $100 per acre against growers who violated the supply reductions.

175.   UPGA argued in its newsletter that its acreage buy-out and reduction program would lead to significant financial returns for growers: "[w]ithout the Acreage Buy-Out program, growers very likely will be looking at GRI's next year that will be $3 to $4 per cwt. lower versus 2005. Please do not forget the lessons of the last few bad years caused by overproduction. With your $50 per acre 'Payment-in-Kind' investment in the acreage reduction plan, we anticipate 2006 GRI's greater than 2005. Per acre, that is more than a 3000% ROI. It is not a gamble; IT IS SMART BUSINESS AND RISK-MANAGEMENT!!"

CLASS ACTION COMPLAINT            37

176.   UPGA was correct; the potato cartel's efforts began to see significant progress in raising prices starting in 2005 (and continuing to present) as the cartel was able to reduce potato supply. Between September of 2005 and June of 2006, potato growers received an average of $6.67 for every 100 pounds of potatoes – a nearly $4 increase from the previous year. By 2007, farmers were averaging $7.75 for every 100 pounds of potatoes.

177.   According to a *Spudman* reader survey in May of 2006 – cited in then-UPGA CEO Julia Cissel's 2006 PowerPoint presentation titled "Managing Supply and Influencing Acreage" – "85% of all respondents said they have seen an increase in their profits since UPGA was formed."

178.   UPGA's and UPGI's potato acreage reductions and subsequent price increases carried on into 2007, 2008 and to the present.

179.   UPGA and UPGI's 2007-08 United Acreage Reduction Program established the following rules similar to those of the earlier years: Each base potato acre was assessed at $50. A base year relative to which the acreage reduction was calculated was 2004. Members and *non-members* willing to participate in the program had two options. The first option was to reduce potato planting area by exactly 15% relative to the 2004 year base. This option was considered to be a payment in kind and the grower would owe no cash. The second option was to reduce potato acreage by less than 15% relative to the 2004 year base. In this case, the grower was assessed a pro-rated percentage of $50 per acre on all base acres.

180.   There were four levels of the pro-rated percentage. For example, if a grower's acreage reduction was between 10% and 14.99%, then the grower paid $20 per base acre; if the acreage reduction was between 5% and 9.99%, then the

CLASS ACTION COMPLAINT          38

grower paid $30 per base acre. The collected money was used to "buy out" acres elsewhere. Growers who decided to expand beyond their base were assessed $100 per acre on all acres (expansion plus base acres). This fee was a punitive measure to prevent the "mindless expansion" that UPGI and UPGA considered to be illegitimate and against the mission of supply reduction.

181.   Those SIPCO members of UPGI who grew only processing potatoes were allowed to plant only contracted processing potato acres. The UPGI/SIPCO members who grew both fresh and processing potatoes were required to follow the potato planting guidelines for their fresh potato acres and were allowed to plant only contracted processing potato acres.

182.   All UPGA and UPGI members (and some non-members) agreed to these programs and reduced supply as a result, or paid assessments to allow others to reduce supply.

183.   In 2008, growers following UPGA's plans planted on 80,000 fewer acres than in 2007. In Idaho alone, growers reduced acreage from 350,000 to 300,000. In an interview about why farmers were cutting acres, UPGI's CEO, Jerry Wright, stated: "[y]ou have the combination of growers having alternative cash crops and they know they have to reduce potato planting to get supply in balance with demand. This is the year they've been able to do it."

184.   As a result of these efforts, by the summer of 2008, according to the Idaho Potato Commission, a ten pound bag of potatoes cost consumers $15 — up $6 over 2007.

A 2008 study by an Agricultural Economics Professor at the University of Idaho confirmed that UPGI's and UPGA's efforts had led to increased prices. The study found that the Idaho monthly fresh potato prices increased from $3.89 per cwt in

the pre-cooperative period to $6.63 per cwt in the co-op period, while the US monthly fresh potato prices increased from $7 per cwt. to $10.19 per cwt. The study found that approximately 60% of the price increases were due to reasons other than increased production costs and that the cooperatives' price-fixing efforts were "likely to be the most significant factor explaining the identified price increases."

185.   The study found that "[a]s indicated by the US monthly fresh potato prices, all potato growers received higher prices since 2005, after the acreage management programs started being implemented in several potato growing regions in the country." Furthermore, the authors concluded, "we believe that the [UPGI] and potato growers cooperatives with similar objectives were successful in accomplishing their goals and impacted the fresh potato price level and volatility during the period of 2005-2008, which ultimately benefited all potato growers."

186.   In an article in the December 15, 2008, issue of *Packer Online*, Paul Dolan, General Manager of Associated Potato Growers, Inc., noted that demand was down from 2007 because potato prices were 50% higher than the previous year, a situation he attributed in part to "market unity."

187.   By 2009, potato prices had remained constant or grown for four consecutive growing seasons -- something that had never happened in more than a century that USDA has been keeping such records.

188.   On its previous website FAQs, UPGA stated that there was "no doubt" that its numerous efforts to reduce supply had impacted and improved potato prices: "Q. How can you prove that UPGA's efforts to manage supply influenced last year's price? A. While many factors influence supply, there is no

CLASS ACTION COMPLAINT          40

doubt that UPGA's acreage reduction, acre buy-down, flow-control, and information sharing programs impacted the market."

189.   UPGA's annual report also discussed how its anticompetitive scheme affected prices for process potatoes: "[b]efore United [UPGA] was formed nearly all of the process contracts were tonnage-based. As a result, process growers overplanted to avoid penalties associated with not delivering enough potatoes to meet their contract. The Potato Marketing Association of North America and processors began to switch the contracts from tonnage-based to acreage-based contracts. Acreage-based contracts minimized the uncertainty for the process grower and frozen processor while also reducing excessive flow of potatoes from the process sector to the fresh sector. Graph #3 reveals the frozen processing usage volumes versus out of field contract prices in Washington. [UPGA] has a data sharing agreement with PMANA [the Potato Marketing Association of North America] to improve the profitability of process growers."

190.   Thus, Defendants and their co-conspirators' acreage restrictions, acreage buy-downs, and flow control measures caused potato prices to be fixed, raised, maintained and/or stabilized.

191.   Defendants' anticompetitive scheme has continued to the present. For example, a May 2010 UPGA newsletter describes how 400 fresh and process potato growers in the United States attended 16 United Potato Partners seminars this year at which they "consider[ed] the latest about cost of production specific to their area, ponder[ed] current demand data and review[ed] United's published acreage guidelines before beginning spring planting." The seminars were designed to facilitate "informal discussions." As Mr. Shahan was quoted as saying, "[t]hese seminars are one of the most important methods we have

CLASS ACTION COMPLAINT          41

for communicating United's published acreage planting guidelines to member and non-member growers in a face-to-face setting." At each of these seminars, a representative of Defendant Bayer CropScience was also present.

192.    Similarly, on its website, UPGI has a page devoted to its 2010 Planting Guidelines, which were issued in September of 2009. UPGI has the following to say about planting:

> Harvest is in full swing, and many are establishing plans for next year's potato crop. By now, all of you already know the top line on this year's crop. Across the state, it appears we are experiencing higher yields. If this continues, we could have as much as 5% more potatoes statewide than expected. The same thing is happening in Wisconsin and Colorado. They, too, are experiencing higher yields. Your markets are already telling you what to expect. The GRI on Norkotahs today is $4.66 and on Burbanks it is $5.52. Realistically, given the likely size of this year's crop, we could easily see a larger than normal carry over into next year.
>
> **With this potential in mind, United of Idaho's Supply Committee is in agreement with ALL of the United of America Directors in recommending the follow planting guidelines for next year. All growers are asked to plant 70-75% of their 2004 base in 2010 to BALANCE next year's crop with this year's anticipated large carry over.** This recommendation to cut 25–30% off your 2004 base acres will be finalized in November when we have the final tally on this year's yields and production nationwide. This same 70-75% planting guideline is extended to all fry contract growers. (Emphasis added.)

193.    All Defendants involved in potato growing and selling operations (including Wada Farms and Wada Farms Marketing Group (on behalf of

CLASS ACTION COMPLAINT          42

themselves and Dole Foods); Potandon (on behalf of itself and General Mills); Blaine Larsen Farms; Michael Cranney doing business as Cranney Farms; Cornelison Farms; Snake River Plains Potatoes; Driscoll Potatoes; Lance Funk doing business as Lance Funk Farms; Rigby Produce; Pleasant Valley Potato; Raybould Brothers Farms; and RD Offutt) were direct participants in the supply reduction scheme outlined and followed acreage reductions, participated in the bid-buy-down program, participated in and utilized information obtained from marketing calls and packing reports and/or reduced the domestic supply of potatoes for the express purposes of fixing, raising, maintaining and/or stabilizing prices.

194.   While certain aspects of UPGA's schemes have been publicly discussed, all attendees to UPGA Board of Directors and Committee meeting attendees must have signed a "United Confidentiality Agreement" each year and promised not to disclose information shared at these meetings.

195.   Any violation of that agreement allows UPGA to exclude such person from future meetings or to sue such a person in a court of law to halt disclosure and for damages experienced by UPGA as a result of any such disclosure.

## DEFENDANTS ARE NOT ENTITLED TO PROTECTION OF THE CAPPER-VOLSTEAD ACT

196.   The Capper-Volstead Act provides an exemption from antitrust law for certain associations and cooperatives comprising agricultural producers that meet specific criteria. The Act protects an association and its members from antitrust scrutiny, provided that: (1) the association is operated for the mutual benefit of its members; (2) no member of the association is allowed more than one vote because of the amount of stock or membership capital he may own therein, or that the association does not pay dividends on stock or membership capital in

excess of 8 per centum per annum; and (3) the association does not deal in the products of nonmembers to an amount greater in value than such as are handled by it for members. The antitrust immunity provided by the Capper-Volstead Act is "limited" and does not exempt all cooperative conduct from review.

197.   The Capper-Volstead Act only protects "persons engaged in the production of agricultural products as farmers, planters, ranchmen, dairymen, nut or fruit growers." This phrase does not extend to a processor of agricultural products or any person or entity not engaged in farming, planting, ranching, and growing. Capper-Volstead Act immunity will not protect an association or any of its members if even one member fails to qualify as a "person[] engaged in the production of agricultural products."

198.   In a 1985 publication titled "Understanding Capper-Volstead," reprinted in 1995, the USDA stated that "if an association of producers . . . restricts members' agricultural output . . . [or] colludes with third parties to fix prices . . . [or] conspires with third parties to fix prices . . . [or] combines with other firms to substantially lessen competition . . . " then "it may find itself just as subject to prosecution for being in violation of the antitrust laws as would any other firm that engages in such practices."

199.   UPGI, UPGA and their co-conspirators have touted their purported immunity from suit under the Capper-Volstead Act and have prominently featured the advice of their antitrust lawyer (Randon Wilson of the Jones Waldo law firm) in publicly available, non-privileged documents as cover for their admitted supply-restriction efforts and conspiracy to fix, raise, maintain and/or stabilize prices.

200.   UPGA and its co-conspirators' efforts at reducing potato supply prices fall outside  the legitimate activities of the Capper-Volstead Act. UPGA, UPGI and

their co-conspirators have engaged in all of the activities discussed above, as well as others, which have negated their ability to claim immunity from antitrust laws under the Capper-Volstead Act.

201.   UPGA, UPGI and their co-conspirators are not entitled to the limited protections found in the Capper-Volstead Act for at least the following reasons:

(a) UPGA and its members (including UPGI and the other member cooperatives) are not legitimate cooperatives and they do not market, process or sell potatoes—they are instead trade groups designed to serve as forums for a nationwide (and continent-wide) agricultural supply-restriction agreement among competitors. Their efforts have improperly and unduly enhanced prices;

(b) UPGA and its members are made up of vertically integrated producers that are also packers and shippers in violation of the Capper-Volstead Act;

(c) UPGA and its members implement predatory conduct and impose coercive, punitive and retaliatory measures against members that do not comport with the supply reduction conspiracy;

(d) UPGA, its members, and co-conspirators have conspired and colluded with third parties to reduce supply and fix prices;

(e) UPGA, its members, and co-conspirators have conspired and colluded with non-member potato farmers to reduce supply and fix prices;

(f) UPGA, its members, and co-conspirators have conspired and colluded with foreign entities, including the United Potato Growers of Canada and Potato Marketing Association of North America, in an attempt to reduce supply and fix prices for the North American continent;

(g) UPGA, its members, and co-conspirators have conspired and colluded with non-member "partners" who are not engaged in agricultural production and who have funded potato supply control efforts; and

(h) UPGI, its members, and co-conspirators have conspired and colluded with "United II" — a non-grower, vertically integrated potato purchaser, to assist with supply-restriction efforts.

202.   UPGA-member cooperatives are made up of direct competitors rather than small farmers banding together to cut out the corporate middlemen who would otherwise market their potatoes. These cooperative members do not

CLASS ACTION COMPLAINT          46

1   associate to collectively process, handle and market their products, and UPGA

2   does not provide those services.

3       203.   UPGA does not wash, grade, package, store, transport or distribute its

4   members' potatoes. UPGA does not negotiate contracts of sale for its members.

5   UPGA does not "market" its members' products. Rather, as set forth in its

6   promotional materials, publications, website and numerous public statements,

7   UPGA was founded for the express purpose of implementing a scheme to manage

8   and restrict the supply of potatoes.

9       204.   Mr. Wilson, UPGA's attorney, publicly discussed that shippers and

10  packers could not be affiliated with any Capper-Volstead Act potato cooperatives.

11      205.   The Capper-Volstead Act does not protect fully integrated producers

12  that also grow, pack, process, store and ship potatoes.

13      206.   Many of the founders of UPGI and UPGA, as well as numerous other

14  co-conspirators, are integrated operators (called grower-shippers) that grow, pack,

15  process, store and ship their own and other growers' potatoes.

16      207.   For example, Defendant Wada Farms operates a 140,000 square foot

17  packing facility in Pingree, Idaho. Wada also operates a 35,000 square foot

18  Blackfoot, Idaho, facility with partner Van Orden Enterprise.

19      208.   Idaho grower-shippers involved in the conspiracy alleged (some of

20  whom are named as Defendants herein) include, among others: Wada Farms;

21  Larsen Farms; Cummins Family Produce, Inc.; Driscoll Potatoes; Floyd Wilcox &

22  Sons, Inc.; Howard Taylor & Sons, Inc.; Pleasant Valley Potato; Rigby Produce;

23  and Snake River Plains Potatoes.

24      209.   UPGA and its regional co-operative members routinely coerced and

25  conspired with non-members in seeking to reduce potato supply and explicitly

CLASS ACTION COMPLAINT          47

recognized the importance of having non-members follow their planting reductions and other supply-restriction efforts.

210.   In a publicly disclosed interview on UPGA's website, not subject to attorney client privilege, UPGA's attorney Randon Wilson stated, "cooperatives wishing to benefit from the limited antitrust protection afforded by the Capper-Volstead Act must make sure that they do not enter into agreements with non-members to fix prices of limit supplies. They cannot be predatory or unduly enhance prices." This advice was not followed.

211.   UPGA and UPGI specifically sought out and allowed non-members to participate in their acreage reduction programs.

212.   Non-members were not only invited to participate in the price fixing scheme alleged, but they actively participated at UPGA's direction and request.

213.   The Capper-Volstead Act does not protect non-United States farmers or cooperatives, nor does the Act protect domestic cooperatives that conspire with non-protected entities, such as foreign producers, to reduce global agricultural supply.

214.   In implementing the output restriction scheme UPGA has conspired with a Canadian potato association and a North American growers association made up of many Canadian growers.

215.   UPGA and UGPC are admittedly jointly managing North American potato supply.

216.   The UPGA and UPGC have an interest in preventing lower-priced imports from each other's members. By jointly agreeing on supply restrictions, each can limit or minimize the deleterious effects of low-priced imports flooding their market.

CLASS ACTION COMPLAINT          48

217.   UPGA has "partnered" with non-agricultural producing companies that explicitly conspire with UPGA and assist in its efforts to reduce potato supply so that the companies can have access to UPGA members to sell their products.

218.   UPGA's website discusses this "United Partners Program" as a "strategic alliance" by which partner companies help offset UPGA's costs in implementing its supply-restriction scheme:

> Q: What is the United Potato Partners Program?
> A: The United Potato Partners Program has three objectives: 1. Maximize the price the potato producer receives for his annual crop. 2. Minimize the cost of gathering the market data that allows the producer to maximize price. 3. Provide manufacturers of crop-input products a direct link to their grower-users.
>
> The market intelligence supplied by United's database matches supply to demand such that grower returns remain positive and stable. Financially healthy growers can afford healthy budgets. **There is a cost to acquiring, analyzing, and implementing the data relating to potato markets. Until now, these costs have been borne by United's growers. Corporations that supply potato growers with everything from potato handling equipment, to tractors, to field chemicals and fertilizers, irrigation equipment, and packing and packaging equipment can now, through a carefully structured program, offset the cost of the database nationally and regionally.** (Emphasis added.)

219.   As part of this transaction, UPGI formed United II, a second co-op based in Idaho Falls, Idaho. All UPGI members were able to join the new co-op (and had to join to be able to sell potatoes to the venture). With RD Offutt Co., United II next formed a joint venture, North American Foods, LLC. This joint

CLASS ACTION COMPLAINT          49

venture purchased Idaho Fresh-Pak, Inc. ("IFP") — the country's third-largest potato dehydration company. The purchase included IFP's four Idaho plants and the "Idahoan" brand names. RDO contributed its three dehydration plants situated in North Dakota, Nevada, and Idaho along with its production agreement with Idaho Supreme Potatoes, Inc. Under a formula-based pricing arrangement, United II growers supply all the potatoes for the Idaho and Nevada plants.

220.    United II potato growers have ownership of the new company, receive dividends, and have a guaranteed market for their dehydrator-grade potatoes.

221.    In December 2007, UPGI announced the new "Idahoan Fresh Potato Plan" as part of this venture and as a means to further control supplies and fix prices where UPGI proposed that growers sell 100% of their potatoes to Idahoan Fresh.

## ANTICOMPETITIVE EFFECTS OF DEFENDANT'S CONDUCT

222.    The above aggressive anticompetitive practices and illegal exclusionary conduct has had the following effects, among others:

(a) Price competition among the Defendants and their co-conspirators in the sale of potatoes was restrained and suppressed;

(b) Prices of potatoes manufactured and sold in the United States by the Defendants and their co-conspirators were fixed, raised, maintained and/or stabilized at supracompetitively higher, non-competitive levels; and

(c) Indirect purchasers of potatoes, including Plaintiff and Class

members, were deprived of the benefits of free and open

competition in the purchase of potatoes.

223.   Defendants' contract, combination and conspiracy described consists of a continuing agreement, understanding and concert of action among the Defendants and their co-conspirators, the substantial terms of which were to artificially fix, raise, maintain and/or stabilize prices paid by Plaintiff and Class members for the indirect purchase of potatoes in the United States, its territories and possessions.

224.   In formulating and effectuating the contract, combination or conspiracy, Defendants and their co-conspirators did those things that they unlawfully combined and conspired to do, including, among other things: agreeing to artificially fix, raise, maintain and/or stabilize prices for potatoes in California; and implementing and monitoring the conspiracy among cartel members.

225.   There are no legitimate pro-competitive efficiencies that justify Defendant's conduct or outweigh its substantial anticompetitive effects.

## INJURY TO PLAINTIFF AND CLASS MEMBERS

226.   The activities described above have been engaged in by Defendants and their co-conspirators for the purpose of effectuating the unlawful agreement to fix, raise, maintain and/or stabilize the prices for potatoes sold in the United States.

227.   As a direct and proximate result of the contract, combination and conspiracy alleged, Plaintiff and other members of the classes were, and continue to be, damaged in their business or property in that they paid supracompetitive

CLASS ACTION COMPLAINT          51

prices for potatoes products during the Class Period, higher than that which they would have paid in the absence of the contract, combination and conspiracy.

## FIRST CAUSE OF ACTION

## FOR VIOLATIONS OF THE CARTWRIGHT ACT

## (CALIFORNIA BUSINESS AND PROFESSIONS CODE §§16720, *ET SEQ.*)

228.    Plaintiff realleges and incorporates by reference each of the foregoing paragraphs, and further alleges as follows.

229.    Plaintiff and members of the Class are "persons" within the meaning of the Cartwright Act, as defined in §16702.

230.    Defendants and their co-conspirators have engaged in illegal, unfair and deceptive trade practices, including, but not limited to, entering into exclusive dealing arrangements in an unreasonable restraint of trade in violation of the California Cartwright Act, Business and Professions Code §16720.

231.    Defendants and their co-conspirators knowingly and willingly engaged in a course of conduct designed o establish a fraudulently obtained monopoly and agreed and conspired to extend that monopoly power in violation of California Business and Professions Code § 16726.

232.    The illegal, unfair or deceptive trade practices alleged in this Complaint have prevented or suppressed competition, and resulted in the prices for potatoes to be illegally inflated.  The illegal, unfair or deceptive trade practices alleged in this Complaint violate the California Cartwright Act, Business and Professions Code Section 16720, *et seq.*, and are at a minimum an unreasonable and unlawful restraint of trade.

233.    As a direct and proximate result of Defendants' contracts to restrain trade and monopolize the relevant market, Plaintiff and the Class have suffered

injury to their property and have been deprived of the benefits of free and fair competition on the merits.

234.   As a result of Defendants' unlawful conduct, Plaintiff has sustained damages by paying supra-competitive prices that would not have been incurred but for Defendant's unlawful conduct as alleged in this Complaint, and is entitled to recover from Defendants the full consideration paid for potatoes, treble damages and equitable relief, under the California Cartwright Act, Business and Professions Code §§ 16750(a) and 16761.

## SECOND CAUSE OF ACTION

## FOR VIOLATIONS OF THE UNFAIR COMPETITION ACT

## (CALIFORNIA BUSINESS AND PROFESSIONS CODE §§17200, *ET SEQ.*)

235.   Plaintiff realleges and incorporates by reference each of the foregoing paragraphs, and further alleges as follows.

236.   The aforementioned conduct by Defendants and their co-conspirators was intended to constitute unfair competition and unlawful business practices that are forbidden by law within the meaning of California Business and Professions Code §§17200, *et seq*.

237.   The acts or practices described above are in violation of California Business and Professions Code §§16720, *et seq*., and are otherwise unfair, unconscionable, unlawful or fraudulent and in violation of the laws of the State of California.

238.   As a result of these violations of California Business and Professions Code §§ 17200, *et seq*., Defendants and their co-conspirators have unjustly enriched themselves at the expense of Plaintiff and the Class members.

CLASS ACTION COMPLAINT            53

239.   Defendants and their co-conspirators should be required, pursuant to California Business and Professions Code Sections 17202-04, to disgorge their illegal gains for the purpose of making full restitution to all injured Class members as identified above.  Defendants and their co-conspirators should also be permanently enjoined from any continuing violations of California Business and Professions Code Section 17200, *et seq.*

## THIRD CAUSE OF ACTION

## FOR UNJUST ENRICHMENT

240.   Plaintiff realleges and incorporates by reference each of the foregoing paragraphs, and further alleges as follows.

241.   Defendants have benefited from unlawful acts through the overpayments and increased profits for potatoes paid for by Plaintiff and the Class.

242.   It would be inequitable for Defendants to retain the benefits resulting from these overpayments, which were conferred by Plaintiff and the Class.

243.   Plaintiff and the Class are entitled to the establishment of a constructive trust consisting of the benefit to Defendants of such overpayments, from which Plaintiff and the Class may make claims on a pro-rata basis for restitution.

## FOURTH CAUSE OF ACTION

## FOR COMMON LAW MONOPOLIZATION

244.   Plaintiff realleges and incorporates by reference each of the foregoing paragraphs, and further alleges as follows.

CLASS ACTION COMPLAINT          54

245.    Defendants and co-conspirators have engaged in predatory and anticompetitive conduct to intentionally obtain and maintain their monopoly power in the relevant market in violation of common law.

246.    Defendants willfully acquired their monopoly and maintained it by suppressing the competition in potatoes through restrictive and exclusionary conduct.

247.    Plaintiff and the Class suffered injury in their business and property as a result of Defendants' monopoly power and anticompetitive conduct.

## **DAMAGES**

248.    During the Class Period, Plaintiff and the other members of the Class purchased potatoes from Defendants, or their subsidiaries, agents, affiliates and/or co-conspirators, and by reason of the antitrust violations alleged in this Complaint, paid more for such items than they would have paid in the absence of such antitrust violations.  As a result, Plaintiff and the other members of the Class have sustained damages to their business and property in an amount to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that:

A.    This action may properly be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the class representative and designating his counsel as counsel for the Class;

B.    Plaintiff and the Class be awarded treble damages as a result of Defendants' conduct alleged in this Complaint, as provided by California Business and Professions Code §16750(a);

1    C.    The Defendants be enjoined from continuing the illegal, unfair and
2    deceptive business acts and practices described in this Complaint;
3    D.    Plaintiff and the Class be awarded their reasonable costs and expenses
4    incurred in this action, including counsel fees and expert fees pursuant to
5    California Code of Civil Procedure § 1021.5; and
6    E.    Judgment be entered in favor of Plaintiff and each member of the
7    Class against Defendants in and amount to be trebled in accordance with the
8    antitrust laws, including interest thereon; and
9    F.    For such other and further relief as the nature of this case may require
10   or as this court deems just, equitable and proper.

11

12                            **JURY DEMAND**

13        Plaintiff hereby demands a trial by jury.

14

15   DATED: June 23, 2010                GLANCY BINKOW & GOLDBERG LLP
16
17   _____
     Lionel Z. Glancy
     Michael Goldberg
18   Susan G. Kupfer
     Joseph Barton
19   1801 Avenue of the Stars, Suite 311
     Los Angeles, CA 90067
20   Telephone: (310) 201-9150
     Facsimile:  (310) 201-9160
21
22   *Attorneys for Plaintiff and the Proposed
     Class*
23
24
25

CLASS ACTION COMPLAINT            56

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge John F. Walter and the assigned discovery Magistrate Judge is Victor B. Kenton.

The case number on all documents filed with the Court should read as follows:

### CV10- 4647 JFW (VBKx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

==================================================================

### NOTICE TO COUNSEL

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

[X] **Western Division**
312 N. Spring St., Rm. G-8
Los Angeles, CA 90012

[ ] **Southern Division**
411 West Fourth St., Rm. 1-053
Santa Ana, CA 92701-4516

[ ] **Eastern Division**
3470 Twelfth St., Rm. 134
Riverside, CA 92501

Failure to file at the proper location will result in your documents being returned to you.

ORIGINAL

Name & Address:
Lionel Z. Glancy (134180)
Michael Goldberg (188669)
Glancy Binkow & Goldberg LLP
1801 Avenue of the Stars, Suite 311
Los Angeles, CA 90067 (310) 201-9150

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| TODD SIMON, Individually and on Behalf of all Others Similarly Situated,<br><br>PLAINTIFF(S)<br><br>v.<br><br>UNITED POTATO GROWERS OF IDAHO, INC.,<br>[See Attachment for Additional Defendants]<br><br>DEFENDANT(S). | CASE NUMBER<br><br>**CV 10 4647** JFW (VBK)<br><br>**SUMMONS** |

TO: DEFENDANT(S): THE ABOVE-NAMED DEFENDANTS

A lawsuit has been filed against you.

Within __21__ days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☑ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff's attorney, __Lionel Z. Glancy_____, whose address is __1801 Avenue of the Stars, Suite 311, Los Angeles, CA  90067_____.  If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint.  You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: __2 3 JUN 2010_____

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States.  Allowed 60 days by Rule 12(a)(3)].*

---

SUMMONS

SUMMONS


[Attachment of Additional Defendants]


UNITED POTATO GROWERS OF AMERICA, INC.; UNITED II POTATO
GROWERS OF IDAHO, INC.; ALBERT WADA; WADA FARMS, INC.;
WADA FARMS POTATOES, INC.; WADA-VAN ORDEN POTATOES, INC.;
WADA FARMS MARKETING GROUP, LLC; DOLE FRESH VEGETABLES,
INC; DOLE FOOD COMPANY, INC..; BLAINE LARSEN FARMS, INC.;
POTANDON PRODUCE LLC; GENERAL MILLS, INC.; MICHAEL
CRANNEY d/b/a CRANNY FARMS; CORNELISON FARMS, INC.; SNAKE
RIVER PLAINS POTATOES, INC.; DRISCOLL POTATOES, INC.; LANCE
FUNK d/b/a LANCE FUNK FARMS; RIGBY PRODUCE, INC.; PLEASANT
VALLEY POTATO, INC.; RAYBOULD BROTHERS FARMS LLC; RD
OFFUTT CO.; IDAHOAN FOODS, LLC and BAYER CROPSCIENCE LLP

V/AXED

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

| I (a) PLAINTIFFS (Check box if you are representing yourself ☐) | DEFENDANTS |
|---|---|
| Todd Simon | See Exhibit A Attached. |

| (b) Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.) | Attorneys (If Known) |
|---|---|
| Lionel Z. Glancy<br>Glancy Binkow & Goldberg LLP<br>1801 Ave of the Stars #311 LA CA 90067 (310) 201-9150 | |

## II. BASIS OF JURISDICTION (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff

☐ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant

☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☒ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. ORIGIN (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

## V. REQUESTED IN COMPLAINT:    JURY DEMAND: ☒ Yes  ☐ No (Check 'Yes' only if demanded in complaint.)

CLASS ACTION under F.R.C.P. 23: ☒ Yes  ☐ No    ☒ MONEY DEMANDED IN COMPLAINT: $ to be proved

## VI. CAUSE OF ACTION (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
28 U.S.C. §1332(D)(2) - Unfair Business Practices

## VII. NATURE OF SUIT (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | | ☐ 540 Mandamus/ Other | ☐ 740 Railway Labor Act |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | | ☐ 345 Marine Product Liability | BANKRUPTCY | ☐ 550 Civil Rights | ☐ 790 Other Labor Litigation |
| ☐ 480 Consumer Credit | ☐ 151 Medicare Act | ☐ 350 Motor Vehicle | ☐ 422 Appeal 28 USC 158 | ☐ 555 Prison Condition | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 490 Cable/Sat TV | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 355 Motor Vehicle Product Liability | ☐ 423 Withdrawal 28 USC 157 | FORFEITURE/ PENALTY | PROPERTY RIGHTS |
| ☐ 810 Selective Service | | ☐ 360 Other Personal Injury | CIVIL RIGHTS | ☐ 610 Agriculture | ☐ 820 Copyrights |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 362 Personal Injury-Med Malpractice | ☐ 441 Voting | ☐ 620 Other Food & Drug | ☐ 830 Patent |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 160 Stockholders' Suits | ☐ 365 Personal Injury-Product Liability | ☐ 442 Employment | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 840 Trademark |
| ☐ 890 Other Statutory Actions | ☐ 190 Other Contract | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 443 Housing/Acco-mmodations | | SOCIAL SECURITY |
| ☐ 891 Agricultural Act | ☐ 195 Contract Product Liability | REAL PROPERTY | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 892 Economic Stabilization Act | ☐ 196 Franchise | ☐ 210 Land Condemnation | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 893 Environmental Matters | REAL PROPERTY | ☐ 220 Foreclosure | IMMIGRATION | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 894 Energy Allocation Act | ☐ 210 Land Condemnation | ☐ 230 Rent Lease & Ejectment | ☐ 462 Naturalization Application | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 895 Freedom of Info. Act | ☐ 220 Foreclosure | ☐ 240 Torts to Land | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 230 Rent Lease & Ejectment | ☐ 245 Tort Product Liability | ☐ 465 Other Immigration Actions | | FEDERAL TAX SUITS |
| ☐ 950 Constitutionality of State Statutes | ☐ 240 Torts to Land | ☐ 290 All Other Real Property | ☐ 440 Other Civil Rights | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

FOR OFFICE USE ONLY:    Case Number:    CV10 4647

AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.

**UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA**
CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case?  ☑ No   ☐ Yes
If yes, list case number(s): _____

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply)  ☐ A.  Arise from the same or closely related transactions, happenings, or events; or
☐ B.  Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C.  For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D.  Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

**IX. VENUE:**  (When completing the following information, use an additional sheet if necessary.)

(a)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐  Check here if the government, its agencies or employees is a named plaintiff.  If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles County, CA | |

(b)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐  Check here if the government, its agencies or employees is a named defendant.  If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Dole Fresh Vegetables, Inc. - Monterey, CA<br>Dole Food Company, Inc. - Westlake Village, CA | See Exhibit B Attached |

(c)  List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
Note: In land condemnation cases, use the location of the tract of land involved.

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| LOS ANGELES COUNTY | |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____   Date 06/23/2010

**Notice to Counsel/Parties:**  The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |

EXHIBIT A

(List of Defendants)

UNITED POTATO GROWERS OF IDAHO, INC., UNITED POTATO
GROWERS OF AMERICA, INC.; UNITED II POTATO GROWERS OF
IDAHO, INC.; ALBERT WADA; WADA FARMS, INC.; WADA FARMS
POTATOES, INC.; WADA-VAN ORDEN POTATOES, INC.; WADA FARMS
MARKETING GROUP, LLC; DOLE FRESH VEGETABLES, INC; DOLE
FOOD COMPANY, INC..; BLAINE LARSEN FARMS, INC.; POTANDON
PRODUCE LLC; GENERAL MILLS, INC.; MICHAEL CRANNEY d/b/a
CRANNY FARMS; CORNELISON FARMS, INC.; SNAKE RIVER PLAINS
POTATOES, INC.; DRISCOLL POTATOES, INC.; LANCE FUNK d/b/a
LANCE FUNK FARMS; RIGBY PRODUCE, INC.; PLEASANT VALLEY
POTATO, INC.; RAYBOULD BROTHERS FARMS LLC; RD OFFUTT CO.;
IDAHOAN FOODS, LLC and BAYER CROPSCIENCE LLP

EXHIBIT B

(Residence of Defendants)

UNITED POTATO GROWERS OF IDAHO, INC. – Idaho Falls, Idaho

UNITED POTATO GROWERS OF AMERICA, INC. – Salt Lake City, Utah

UNITED II POTATO GROWERS OF IDAHO, INC. – Idaho Falls, Idaho

ALBERT WADA – Pingree, Idaho

WADA FARMS, INC. – Blackfoot, Idaho

WADA FARMS POTATOES, INC. – Blackfoot, Idaho

WADA-VAN ORDEN POTATOES, INC. – Blackfoot, Idaho

WADA FARMS MARKETING GROUP, LLC – Pingree, Idaho

BLAINE LARSEN FARMS, INC. – Hamer, Idaho

POTANDON PRODUCE LLC – Idaho Falls, Idaho

GENERAL MILLS, INC. – Minneapolis, Minnesota

MICHAEL CRANNEY d/b/a CRANNY FARMS – Oakley, Idaho

CORNELISON FARMS, INC. – Rexburg, Idaho

SNAKE RIVER PLAINS POTATOES, INC. – Rexburg, Idaho

DRISCOLL POTATOES, INC. – American Falls, Idaho

LANCE FUNK d/b/a LANCE FUNK FARMS – American Falls, Idaho

RIGBY PRODUCE, INC. – Rigby, Idaho

PLEASANT VALLEY POTATO, INC. – Aberdeen, Idaho

RAYBOULD BROTHERS FARMS LLC – Rexburg, Idaho

RD OFFUTT CO. – Fargo, North Dakota

IDAHOAN FOODS, LLC – Grand Forks, North Dakota

BAYER CROPSCIENCE LLP – Durham, North Carolina